## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOEL ROSENFELD IRA, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CYNOSURE, INC., MICHAEL R. DAVIN, WILLIAM O. FLANNERY, BRIAN M. BAREFOOT, ETTORE V. BIAGIONI, MARINA HATSOPOULOS, and THOMAS H. ROBINSON,<br><br>Defendants. | Civil Action No. 17-10309<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joel Rosenfeld IRA ("Plaintiff"), by and through its undersigned counsel, for its complaint against defendants, alleges upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of Cynosure, Inc. ("Cynosure" or the "Company") against Cynosure and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9") and to enjoin the expiration of a tender offer on a proposed transaction, pursuant to which Cynosure will be acquired by Hologic, Inc. ("Hologic"), through its wholly owned subsidiary Minuteman Merger Sub, Inc. ("Purchaser") (the "Proposed Transaction").

2.      On February 14, 2017, Cynosure and Hologic issued a joint press release

announcing that they had entered into an Agreement and Plan of Merger dated February 14, 2017 (the "Merger Agreement") to sell Cynosure to Hologic.  Subject to the terms of the Merger Agreement, Purchaser commenced a tender offer (the "Offer") to purchase all of the outstanding shares of Cynosure common stock for $66.00 per share in cash (the "Offer Price").  Following consummation of the Offer, Purchaser will merge with and into Cynosure with the Company continuing as the surviving corporation of the merger.  The Proposed Transaction is valued at approximately $1.44 billion.  The Offer commenced on February 22, 2017 and will expire on March 21, 2017, and thus, time is of the essence.

3.      On February 22, 2017, Cynosure filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.  The Recommendation Statement, which recommends that Cynosure stockholders tender their shares in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Cynosure's financial projections, relied upon by Cynosure's financial advisor, Leerink Partners LLC ("Leerink"); (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Leerink; and (iii) the background process leading to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(d), 14(e) and 20(a) of the Exchange Act as Cynosure stockholders need such information in order to make a fully informed decision whether to tender their shares in favor of the Proposed Transaction.

4.      In short, the Proposed Transaction is designed to unlawfully divest Cynosure's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the expiration of the tender offer

unless and until such problems are remedied.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Cynosure is incorporated in Delaware and headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Cynosure.

9.      Defendant Cynosure is a Delaware corporation with its principal executive offices located at 5 Carlisle Road, Westford, Massachusetts 01886.  Cynosure's common stock is traded on the NASDAQ under the ticker symbol "CYNO."

10.     Defendant Michael R. Davin ("Davin") has been Chief Executive Officer ("CEO") and a director of the Company since September 2003 and Chairman of the Board since October 2004.  Defendant Davin served as President of the Company from September 2003 to July 2014 and was reappointed to that position in May 2016.

11.     Defendant William O. Flannery ("Flannery") has been a director of the Company since 2013.  Defendant Flannery was elected Lead Director in January 2015 and served as Secretary from 2004 to 2013.

12.     Defendant Brian M. Barefoot ("Barefoot") has been a director of the Company since 2011.

13.     Defendant Ettore V. Biagioni ("Biagioni") has been a director of the Company since 2005.

14.     Defendant Marina Hatsopoulos ("Hatsopoulos") has been a director of the Company since 2008.

15.     Defendant Thomas H. Robinson ("Robinson") has been a director of the Company since 2005.

16.     Defendants Davin, Flannery, Barefoot, Biagioni, Hatsopoulos, and Robinson are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

17.     Hologic is a developer, manufacturer and supplier of premium diagnostic products, medical imaging systems and surgical products with an emphasis on women's health.

18.     Purchaser is a Delaware corporation and a wholly-owned subsidiary of Hologic.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of all persons and entities that own Cynosure common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.      Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

21.      The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of February 15, 2017, there were approximately 23,914,023 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Cynosure or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

22.      Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

    (a)      Whether defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

    (b)      Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

    (c)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    (d)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

23.      Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

26.     Cynosure develops, manufactures and markets aesthetic treatment systems that enable plastic surgeons, dermatologists and other medical practitioners to perform non-invasive and minimally invasive procedures.  The Company also markets radiofrequency ("RF") energy sourced medical devices for precision surgical applications such as facial plastic and general surgery, gynecology, ear, nose and throat procedures, ophthalmology, and oral and maxillofacial surgery, among others.  Cynosure sells its products through a direct sales force in the United States, Canada, France, Morocco, Germany, Spain, the United Kingdom, Australia, China, Japan and Korea, and through international distributors in approximately 120 other countries.

27.     The Company has a two-pronged business strategy: launching new products and technologies for high-growth aesthetic applications developed internally, and expanding the Company's product offerings through acquisitions of complementary businesses and significant partnerships.  For example, in the second half of 2015, Cynosure launched its SculpSure laser system for non-invasive fat reduction treatments.  The SculpSure system is the first hyperthermic laser treatment system cleared by the U.S. Food and Drug Administration.

28.     As a result of its innovation and strong business strategy, Cynosure has reported impressive financial results in recent quarters.  On July 26, 2016, the Company reported its second

quarter 2016 financial results.  Net income was $6.3 million, or $0.27 per diluted share, an 8.3%

increase from $5.4 million, or $0.24 per diluted share in the second quarter of 2015.  Revenue

increased 32% to a record $110.3 million, compared with $83.7 million in the second quarter of

2015.  Commenting on the positive results, defendant Davin stated:

> Our second-quarter performance demonstrates the strong momentum throughout
> our direct sales distribution network. Product revenue in North America increased
> 46 percent in the second quarter to $59.5 million, reflecting the full U.S. rollout of
> SculpSure for non-invasive fat reduction earlier this year, as well as significant
> contributions from our MonaLisa Touch®, PicoSure® and ICON™ products. On
> the international front, our Asia Pacific subsidiaries saw a 46 percent increase in
> product revenue, propelled by the late 2015 regulatory approvals of PicoSure
> in China and SculpSure in Australia. Product revenue from our direct subsidiaries
> in Europe was up 6 percent year-over-year.
>
> We delivered solid operational results, as our gross margin increased more than 2
> percentage points and we generated cash from operations of $16.3 million, bringing
> our cash and investments balance at the end of the quarter to $210.3 million. At the
> same time, we continued to invest in the business, launching a highly targeted
> direct-to-consumer marketing campaign for SculpSure that is attracting new
> customers and patients to the Cynosure brand. In the R&D area, through ongoing
> clinical initiatives, we are investing to expand our products for new aesthetic
> indications and treatment areas.

29.     On October 25, 2016, the Company issued a press release announcing its third

quarter 2016 financial results.  The Company reported revenues of $106.4 million, a 36% increase

from $78.4 million in the third quarter of 2015.  Net income was $4.2 million, or $0.17 per diluted

share, a 29% increase compared to $3.2 million, or $0.14 per diluted share in the third quarter of

2015.  Defendant Davin commented on the quarter's favorable results, noting:

> We delivered a solid operating and financial performance, generating record third-
> quarter revenue, profitable sales growth, expanded margins and positive operating
> cash flow. Product revenue in our North American and international sales channels
> saw double-digit percentage gains in the third quarter, which marked our
> 27th consecutive quarter of year-over-year top-line growth.
>
> SculpSure® has continued to exceed our expectations since we introduced the
> product in the U.S. for non-invasive fat reduction in the fourth quarter of last year.
> Satisfaction among physicians and patients remains very favorable, a point

reinforced by the fact that reorders of SculpSure's PAC keys represented more than 40 percent of total PAC key revenue for the quarter.  Consistent with our global distribution strategy, SculpSure is currently being sold through  our direct sales force in Europe and Australia as well as select international distributors. We also are in the process of introducing SculpSure to physicians in Canada and through our subsidiary in Korea following recent marketing clearances in those countries.

International product revenue increased $5.6 million, or 23 percent, in the third quarter of 2016 compared to the prior year period, driven by increased sales from our Asian and European direct offices. In addition to SculpSure, our skin rejuvenation and tattoo products, led by PicoSure®, continued to contribute to the sales growth outside North America – particularly PicoSure in the Asia Pacific region. PicoSure's short-pulse technology, enhanced by our proprietary FOCUS™ Lens Array, has proved to deliver an effective clinical result in the Asia market. With the 755 nm PicoSure gaining market acceptance in China, combined with additional anticipated regulatory clearances, we expect that international product revenue will continue to grow year-over-year.

30.    The Company issued a press release announcing its fourth quarter and full-year 2016 financial results on February 7, 2017, reporting record quarterly revenue of $122.1 million, a 19% increase compared to the fourth quarter of 2015.  Total product revenue increased 20% compared to the fourth quarter of 2015.  For full-year 2016, the Company reported record annual revenue of $433.5 million, a 28% increase from full-year 2015.  Commenting on the exceptional results, defendant Davin stated:

> **We capped an outstanding year with a strong fourth quarter**, as revenue increased 19 percent year-over-year to a quarterly record $122.1 million. The fourth quarter of 2016 marked our 28th consecutive quarter of year-over-year top-line growth, an accomplishment that demonstrates the enduring strength and consistent quality of our product portfolio.  We continue to lead the aesthetic device industry by focusing on innovation, execution and growth.  **The 23 percent compound annual top-line growth we've achieved over the past five years reflects our ability to cultivate the right organic opportunities, make disciplined strategic investments and maintain a solid financial model.**
>
> SculpSure®, our unique laser treatment for non-invasive fat destruction, continues to outpace expectations. In the fourth quarter of 2016, we placed the highest number of SculpSure units in a quarter since we launched the device in late 2015. MonaLisa Touch®, our first aesthetic laser product for women's health, also performed well, recording the second-highest unit placements in a quarter in its history. More than 70 percent of SculpSure sales in the quarter came from the non-core physician

market.  Bundled sales of multiple products increased to 31 percent of revenues during the quarter, which we see as powerful evidence of our competitive advantage as an aesthetic portfolio company.  With the increasing cost and complexity of health insurance, Cynosure offers multiple solutions across four large categories – fat reduction, skin revitalization/tattoo removal, hair removal and women's health – that enable physicians to expand the base of cash-pay patients in their practices.

Demand for aesthetic procedures in North America was our largest growth driver over the course of 2016, led by the full launch of our SculpSure platform in the first quarter.  Our international business gained momentum in the second half of 2016, reflecting our focus on securing additional regulatory clearances such as the third quarter 2016 marketing approval of SculpSure in Korea and the China Food and Drug Administration's clearance of the Icon™ Aesthetic System in November.

Emphasis added.  Defendant Davin further commented on Cynosure's positive business outlook for 2017, stating:

We begin 2017 with a high degree of optimism, confident that we have the right product portfolio, technology and distribution to capitalize on the trends that will shape the aesthetic market in the quarters and years ahead. Our strategy positions us to generate sustained growth from diverse revenue sources, drive long-term profitability and deepen our competitive advantage.

**<u>The Sale Process</u>**

31.     Beginning in February 2016, the Board instructed management and Leerink to conduct a preliminary exploration of opportunities with potential strategic partners and to meet with any such interested parties.

32.     Following a March 17, 2016 business development meeting, Leerink asked five parties whether they would be interested in entering into a confidentiality agreement with the Company.  Four of the parties declined the offer and one of the companies, referred to in the Recommendation Statement as "Party A," entered into a confidentiality agreement with the Company on May 18, 2016.  Over the next few months, Cynosure and Party A held meetings to discuss their businesses and strategic opportunities, entering into a new confidentiality agreement on December 19, 2016 to further these discussions.

33.     On November 2, 2016, defendant Davin met with Stephen MacMillan ("MacMillan"), Hologic's CEO, to discuss their respective businesses and potential future opportunities between the two companies.

34.     On January 6, 2017, Party A submitted a non-binding expression of interest with a value of $59.00 to $61.00 per share in cash.  Following a Board meeting, defendant Davin informed Party A that Party A's proposal was insufficient.

35.     On January 12, 2017, Party A submitted a revised non-binding expression of interest with a value of $61.00 to $63.00 per share in cash.  Cynosure subsequently provided Party A with additional due diligence materials of the Company.

36.     From January 18, 2017 to February 8, 2017, Leerink contacted 12 parties approved by the Board in order to assess their interest in exploring an acquisition of the Company.  Eight of these parties declined to participate and two of the parties did not respond.  The other two parties included Hologic and a party referred to in the Recommendation Statement as "Party B."

37.     On January 23, 2017, Cynosure and Hologic executed a confidentiality agreement. On January 31, 2017, Hologic submitted a non-binding expression of interest valued at $63.00 to $66.00 per share in cash.

38.     At a February 1, 2017 Board meeting, the Board determined to require a markup of a merger agreement and final proposals on value from Hologic and Party A by February 8, 2017. Leerink subsequently informed the parties of this request.

39.      On February 8, 2017, Hologic submitted an updated non-binding expression of interest to acquire the Company for $65.25 per share in cash.  Party A delivered to the Company a proposed price of $63.00 per share in cash.  That same day, Party B submitted a non-binding indication of interest to the Company valued at $65.00 per share in cash.

40.     Following discussion at a February 9, 2017 Board meeting, the Board requested that Party A and Hologic submit their "best and final" offers to the Company.  The Board also determined to enter into a confidentiality agreement with Party B in order to continue communications with it, but after providing Party B with a form of confidentiality agreement on February 10, 2017, it is unclear whether Cynosure and Party B ever executed a confidentiality agreement, and if so, the details thereof.

41.     On February 12, 2017, MacMillan informed defendant Davin that Hologic was increasing its offer to $66.00 per share, which was Hologic's best and final offer.

42.     During a February 13, 2017 Board meeting, the Board determined to pursue an agreement with Hologic over the other parties.

43.     The next morning, Leerink rendered its fairness opinion and the Board approved the Proposed Transaction.  Cynosure and Hologic then finalized and executed the Merger Agreement.

**The Proposed Transaction is Inadequate**

44.     On February 14, 2017, following execution of the Merger Agreement, Cynosure and Hologic issued a joint press release stating, in relevant part:

> MARLBOROUGH, Mass. and WESTFORD, Mass., Feb. 14, 2017 -- Hologic, Inc. (Nasdaq: HOLX), a leader in women's health, and Cynosure, Inc. (Nasdaq: CYNO), a leader in medical aesthetics systems and technologies, announced today they have signed a definitive agreement for Hologic to acquire all outstanding Cynosure shares for $66.00 per share in cash, which corresponds to an equity value of approximately $1.65 billion and an enterprise value of $1.44 billion net of cash.

> The transaction, which has been approved unanimously by the boards of directors of both companies, would extend Hologic's scientific and commercial capabilities into one of the fastest-growing segments in medical technology, while expanding Cynosure's customer reach and addressable market.

"Acquiring Cynosure will accelerate our transformation into a higher-growth company by leveraging our core women's health expertise and OB/GYN channel leadership into an adjacent, cash-pay segment that is expanding at a low double-digit rate," said Steve MacMillan, Hologic's Chairman, President and Chief Executive Officer (CEO). "We had identified medical aesthetics as an attractive and complementary growth opportunity through our strategic planning process, and are pleased to have agreed to acquire Cynosure, the best-in-class company in the space. Together, we can strengthen our shared focus on innovation, market-leading products with demonstrated clinical benefits, and strong customer relationships."

Cynosure has a broad portfolio of more than 20 products across major categories including non-invasive body contouring, hair removal, skin revitalization and women's health. Cynosure sells its products through a combination of direct sales and distributors in over 130 countries. The company has a history of organic innovation, most recently with the introduction of SculpSure®, the world's first FDA-cleared laser treatment for non-invasive body contouring. Cynosure also markets MonaLisa Touch®, a novel $CO_2$ laser for women's health. Cynosure, which reported revenues of $433.5 million in 2016, has posted 28 consecutive quarters of year-over-year top-line growth.

## Insiders' Interests in the Proposed Transaction

45.    Cynosure insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will receive unique benefits from the Proposed Transaction not available to Plaintiff and the public stockholders of Cynosure.

46.    While Cynosure's public stockholders are being cashed out and foreclosed from participating in the future growth of Cynosure, the Company's directors and officers will achieve a substantial payday.  The following tables set forth the amount in cash that will become payable to the Company's officers and directors for their Company shares, stock options, restricted stock units, and performance stock units, respectively, upon consummation of the merger:

| Name | Number of Shares | Cash Consideration Payable in Respect of Shares | |
|---|---|---|---|
| **Executive Officers** | | | |
| Michael R. Davin(a) | 38,625 | $ | 2,549,250 |
| Stephen J. Webber | — | | — |
| Douglas J. Delaney | 15,438 | $ | 1,018,908 |

| **Non-Employee Directors** | | | |
| --- | --- | --- | --- |
| Brian M. Barefoot | 15,850 | $ | 1,046,100 |
| Ettore V. Biagioni | 9,510 | $ | 627,660 |
| William O. Flannery | 14,510 | $ | 957,660 |
| Marina Hatsopoulos | 18,850 | $ | 1,244,100 |
| Thomas H. Robinson | 14,514 | $ | 957,924 |

| Name | Number of Vested Company Stock Options | Cash Consideration Payable in Respect of Vested Company Stock Options(a) | Number of Unvested Company Stock Options | Cash Consideration Payable in Respect of Unvested Company Stock Options(a) |
| --- | --- | --- | --- | --- |
| **Executive Officers** | | | | |
| Michael R. Davin | 16,283 | $   591,272 | 16,887 | $   599,320 |
| Stephen J. Webber | — | — | — | — |
| Douglas J. Delaney | 7,876 | $   285,995 | 8,167 | $   289,847 |
| **Non-Employee Directors** | | | | |
| Brian M. Barefoot | 15,892 | $   638,612 | — | — |
| Ettore V. Biagioni | 29,392 | $ 1,131,482 | — | — |
| William O. Flannery | 23,892 | $   979,012 | — | — |
| Marina Hatsopoulos | 56,892 | $ 2,713,092 | — | — |
| Thomas H. Robinson | 31,392 | $ 1,222,162 | — | — |

| Name | Number of Company RSUs | Cash Consideration Payable in Respect of Company RSUs |
| --- | --- | --- |
| **Executive Officers** | | |
| Michael R. Davin | 58,135 | $   3,836,910 |
| Stephen J. Webber | 19,483 | $   1,285,878 |
| Douglas J. Delaney | 25,599 | $   1,689,534 |
| **Non-Employee Directors** | | |
| Brian M. Barefoot | 1,272 | $   83,952 |
| Ettore V. Biagioni | 1,272 | $   83,952 |
| William O. Flannery | 1,272 | $   83,952 |
| Marina Hatsopoulos | 1,272 | $   83,952 |
| Thomas H. Robinson | 1,272 | $   83,952 |

| Name | Number of Company PSUs(a) | Cash Consideration Payable in Respect of Company PSUs |
| --- | --- | --- |
| **Executive Officers** | | |
| Michael R. Davin | 194,824 | $   12,858,384 |
| Stephen J. Webber | 23,180 | $   1,529,880 |
| Douglas J. Delaney | 50,373 | $   3,324,618 |

47.     Further, in the event they are terminated in connection with the Proposed Transaction, certain named executive officers stand to receive significant payments in the form of golden parachute compensation.   The following table sets forth the golden parachute compensation, including the above-referenced equity payments, each executive officer stands to receive:

| Name | Cash | Equity (1) | Perquisites/ Benefits (2) | Total Value |
|------|------|-----------|---------------------------|-------------|
| Michael R. Davin | $  12,920,062  (3) | $  17,294,614 | $      41,963 | $  30,256,639 |
| Douglas J. Delaney | $    4,397,799  (3) | $    5,303,999 | $      42,207 | $    9,744,005 |
| Stephen J. Webber | $    1,825,781  (4) | $    2,815,758 | $      18,990 | $    4,660,529 |
| Timothy W. Baker | — | $    1,125,935 | — | $    1,125,935 |

## The Recommendation Statement Contains Numerous Material Misstatements or Omissions

48.     The defendants filed a materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Cynosure's stockholders.   The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in connection with the Offer.

49.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Cynosure's financial projections, relied upon by Cynosure's financial advisor, Leerink; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Leerink; and (iii) the background process leading to the Proposed Transaction.   Accordingly, Cynosure stockholders are being asked to make a decision whether to tender their shares in connection with the Offer without all material information at their disposal.

***Material Omissions Concerning Cynosure's Financial Projections***

50.     The Recommendation Statement fails to disclose material information relating to the Company's financial projections provided by Cynosure's management and relied upon by Leerink for its analyses.

51.     For example, the Recommendation Statement discloses projections for various non-GAAP metrics including Operating Income, Net Income and Unlevered Free Cash Flow, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP.  The omission of the aforementioned line item projections renders the non-GAAP projections included in the Recommendation Statement materially misleading and incomplete.

52.     The Recommendation Statement further fails to disclose the following projection line item, which was utilized in calculating the Company's unlevered free cash flows: (i) stock-based compensation expense.  Additionally, in its *Discounted Cash Flow Analysis*, Leerink calculated terminal values for the Company by growing 2022 Earnings before Interest, Taxes, Depreciation and Amortization ("EBITDA") by 10%.  The Recommendation Statement, however fails to disclose the Company's projected EBITDA for years 2017-2022.

53.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     from pages 31-33 of the Recommendation Statement:

**Certain Projected Financial Information.**

The Company does not, as a matter of course, publicly disclose forecasts or projections as to future performance, earnings or other results for extended periods due to, among other reasons, the inherent difficulty of accurately predicting future periods and the likelihood that the underlying assumptions and estimates may prove incorrect. While the Company prepares forecasts annually for internal budgeting

and business planning purposes, such forecasts generally do not cover periods beyond the then current fiscal year.

However, the Company has presented below certain financial projections under the heading "Company Projections" which were prepared by management of the Company in January 2017 to reflect its recent financial results and revised revenue growth outlook (the "Company Forecasts"). These financial projections were not generated for external use and were made available to the Company Board and provided to, and approved for use by, Leerink, in connection with the evaluation of the transactions contemplated by the Merger Agreement. These financial projections were also provided to Parent and Party A for their due diligence investigation of the Company.

The Company Forecasts were not prepared with a view toward public disclosure, nor were they prepared with a view toward compliance with published guidelines of the SEC, the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial forecasts, or U.S. generally accepted accounting principles ("GAAP"). In addition, the Company Forecasts were not prepared with the assistance of, or reviewed, compiled or examined by, independent accountants. The Company Forecasts are prepared on a non-GAAP basis and do not comply with GAAP. The summary of the Company Forecasts is not being included in this Schedule 14D-9 to influence any stockholder's decision whether to tender his, her or its Shares in the Offer, but instead because these financial projections were provided to Leerink and the Company Board to evaluate the transactions contemplated by the Merger Agreement. The Company Forecasts may differ from publicized analyst estimates and forecasts and do not take into account any events or circumstances after the date they were prepared, including the announcement of the Offer and Merger.

The Company Forecasts were based on numerous variables and assumptions, including an assessment of prospects and risks related to estimated future revenues and other industry, market and product related factors, all of which are inherently uncertain and may be beyond the control of the Company's management. Important factors that may affect actual results and result in the Company Forecasts not being achieved include, but are not limited to, risks and uncertainties pertaining to the Company's business, including those risks and uncertainties detailed in the Company's public periodic filings with the SEC. In addition, the Company Forecasts may be affected by the Company's ability to achieve strategic goals, objectives and targets over the applicable period. These assumptions upon which the Company Forecasts were based necessarily involve judgments with respect to, among other things, future economic, competitive and regulatory conditions and financial market conditions, all of which are difficult or impossible to predict accurately and many of which are beyond the Company's control. The Company Forecasts also reflect assumptions as to certain business decisions that are subject to change.

Accordingly, there can be no assurance that the Company Forecasts will be realized, and actual results may vary materially from those shown. The inclusion of the Company Forecasts in this Schedule 14D-9 should not be regarded as an indication that any of the Company, Parent or Purchaser or their respective affiliates, officers, directors, advisors or other representatives considered or consider the Company Forecasts necessarily predictive of actual future events, and the Company Forecasts should not be relied upon as such. None of the Company, Parent or Purchaser or their respective affiliates, officers, directors, advisors or other representatives can give any assurance that actual results will not differ materially from the Company Forecasts, and the Company undertakes no obligation to update or otherwise revise or reconcile the Company Forecasts to reflect circumstances existing after the date they were generated or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the Company Forecasts are shown to be in error. None of the Company, or, to the knowledge of the Company, Parent or Purchaser, intends to make publicly available any update or other revisions to these financial projections. None of the Company or its respective affiliates, officers, directors, advisors or other representatives has made or makes any representation to any stockholder or other person regarding the ultimate performance of the Company compared to the information contained in the Company Forecasts or that projected results will be achieved. The Company has made no representation to Parent or Purchaser, in the Merger Agreement or otherwise, concerning the Company Forecasts.

The estimates of non-GAAP operating income, non-GAAP net income and unlevered free cash flow included in the Company Forecasts were calculated using GAAP and other measures which are derived from GAAP, but such estimates constitute non-GAAP financial measures within the meaning of applicable rules and regulations of the SEC. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by the Company may not be comparable to similarly titled amounts used by other companies.

In light of the foregoing factors and the uncertainties inherent in these projections, stockholders are cautioned not to place undue, if any, reliance on these projections.

*Company Projections (in millions)*

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Revenue | $ 497 | $ 594 | $ 707 | $ 778 | $ 888 | $1,005 |
| Cost of goods sold | $(197) | $(228) | $(260) | $(279) | $(301) | $ (338) |
| Total operating expenses | $(243) | $(292) | $(347) | $(380) | $(426) | $ (479) |
| Non-GAAP operating income (1) | $  57 | $  74 | $ 100 | $ 120 | $ 161 | $  188 |
| Income tax | $  (17) | $  (22) | $  (30) | $  (36) | $  (48) | $  (57) |
| Non-GAAP net income (2) | $  39 | $  50 | $  69 | $  83 | $ 112 | $  131 |
| Unlevered free cash flow (3) | $  42 | $  49 | $  63 | $  78 | $ 106 | $  123 |

(1)  Non-GAAP operating income is calculated as revenue, less cost of goods sold and less total operating expenses.
(2)  Non-GAAP net income is calculated as non-GAAP operating income, less income tax.
(3)  Unlevered free cash flow is calculated as non-GAAP operating income, less income taxes, plus depreciation & amortization, less capital expenditures and less increases in working capital. Stock-based compensation expense is treated as a cash expense for purposes of determining unlevered free cash flow.

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Non-GAAP operating income (1) | $ 57 | $ 74 | $100 | $120 | $161 | $188 |
| Income tax | $ (17) | $ (22) | $ (30) | $ (36) | $ (48) | $ (57) |
| Depreciation & amortization | $ 20 | $ 20 | $ 18 | $ 17 | $ 18 | $ 19 |
| Capital expenditures | $ (14) | $ (16) | $ (18) | $ (18) | $ (19) | $ (20) |
| Increases in working capital | $ (4) | $ (6) | $ (7) | $ (4) | $ (6) | $ (8) |
| Unlevered free cash flow (2) | $ 42 | $ 49 | $ 63 | $ 78 | $106 | $123 |

(1)  Non-GAAP operating income is calculated as revenue, less cost of goods sold and less total operating expenses.
(2)  Unlevered free cash flow is calculated as non-GAAP operating income, less income taxes, plus depreciation & amortization, less capital expenditures and less increases in working capital. Stock-based compensation expense is treated as a cash expense for purposes of determining unlevered free cash flow.

In addition, as part of the projections, the Company prepared the product category level revenue projections as set forth below.

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Body contouring revenue | $ 154 | $ 201 | $ 240 | $ 232 | $ 220 | $ 210 |
| Hair revenue | $ 38 | $ 33 | $ 31 | $ 29 | $ 27 | $ 25 |
| Skin revenue | $ 137 | $ 132 | $ 140 | $ 152 | $ 147 | $ 149 |
| Women's health revenue | $ 46 | $ 65 | $ 71 | $ 73 | $ 73 | $ 74 |
| New platform revenue | $ — | $ — | $ — | $ 15 | $ 55 | $ 115 |
| Other | $ 27 | $ 23 | $ 19 | $ 13 | $ 8 | $ 6 |
| Total product / laser revenue | $ 402 | $ 454 | $ 501 | $ 514 | $ 530 | $ 579 |
| Recurring revenue | $ 95 | $ 140 | $ 206 | $ 264 | $ 358 | $ 426 |
| Total revenue | $ 497 | $ 594 | $ 707 | $ 778 | $ 888 | $ 1,005 |

## *Material Omissions Concerning Leerink's Financial Analyses*

54.     The Recommendation Statement describes Leerink's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Leerink's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Leerink's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Leerink's fairness opinion in determining whether to tender their shares in favor of the

Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Cynosure's stockholders.

55.    For example, with respect to Leerink's *Discounted Cash Flow Analysis* on pages 29-30 of the Recommendation Statement, the Recommendation Statement fails to disclose: (a) the individual inputs and assumptions utilized by Leerink to derive the discount rate range of 14.0% to 16.0%, including the size premium Leerink used; (b) the selected publicly traded medical technology companies that Leerink analyzed to base its selection of terminal EBITDA multiples of 11.0x to 13.0x; and (c) the Company's projected EBITDA for 2022.

56.    The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)    from pages 29-30 of the Recommendation Statement:

*Discounted Cash Flow Analysis*

A discounted cash flow analysis is a traditional valuation methodology used to derive a valuation of an asset or set of assets by calculating the "present value" of estimated future cash flows of the asset or set of assets. "Present value" refers to the current value of future cash flows or amounts and is obtained by discounting those future cash flows or amounts by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, expected returns and other appropriate factors. Leerink performed a discounted cash flow analysis of the Company to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that the Company was forecasted to generate from the second quarter of the Company's fiscal year 2017 through fiscal year 2022, which unlevered, after-tax free cash flows were based on the Forecasts. Leerink calculated terminal values for the Company by growing 2022 Earnings before Interest, Taxes, Depreciation and Amortization ("EBITDA") by 10% and applying terminal EBITDA multiples of 11.0x to 13.0x, which terminal EBITDA multiples were based on the EBITDA multiples of selected publicly traded medical technology companies that Leerink deemed comparable for purposes of its analysis. The cash flows and terminal values were then discounted to present value as of March 31, 2017 using discount rates ranging from 14.0% to 16.0%, which were based on an estimate of the Company's weighted average cost of capital. This range of discount rates was based on Leerink's analysis of the Company's weighted

average cost of capital derived using the Capital Asset Pricing Model, taking into account certain metrics including the Company's levered and unlevered betas, a historical equity risk premium, size premia and yields for U.S. treasury notes. In performing its discounted cash flow analysis, Leerink adjusted for cash balances, including cash and cash equivalents, estimated by the Company's management to equal approximately $238 million as of December 31, 2016, and capital leases, estimated by the Company's management to equal approximately $20 million as of December 31, 2016.

This analysis resulted in an implied per share equity value for the Shares of approximately $63 to $76. Leerink then compared the results of the above analysis to the Consideration of $66.00 per Share to be paid to the holders of Shares (other than Excluded Shares) pursuant to the Merger Agreement.

57.     Without such undisclosed information, Cynosure stockholders cannot evaluate for themselves whether the financial analyses performed by Leerink were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Leerink's opinion and analyses should factor into their decision whether to tender their shares in support of the Proposed Transaction.

***Material Omissions Concerning the Flawed Sale Process***

58.     The Recommendation Statement also fails to disclose or misstates material information relating to the sale process leading up to the Proposed Transaction, including:

(a)     Whether the Company and Party B ever entered into the confidentiality agreement provided by the Company to Party B on February 10, 2017 and, if so, whether the agreement contains a standstill provision that is still in effect and operates to preclude Party B from making a topping bid for the Company.

59.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 20 of the Recommendation Statement:

The Company also provided a form of confidentiality agreement to Party B on February 10, 2017. Party B acknowledged receipt of the confidentiality agreement and indicated they would provide any comments to the agreement as soon as practicable.

60.     Defendants' failure to provide Cynosure stockholders with the foregoing material information renders the statements in the "Background and Reasons for the Company Board's Recommendation" section of the Recommendation Statement false and/or materially misleading and constitutes a violation of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act, and SEC Rule 14d-9 promulgated thereunder.   The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement.   Absent disclosure of the foregoing material information prior to the expiration of the Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations
of Section 14(d) of the Exchange Act and SEC Rule 14d-9**

61.     Plaintiff repeats all previous allegations as if set forth in full.

62.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting Cynosure stockholders to tender their shares in the Offer.

63.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

64.     The Recommendation Statement violates Section14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omission render the Recommendation Statement false and/or misleading.

65.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

66.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision whether to tender their shares if such misrepresentations and omissions are not corrected prior to the expiration of the Offer.  Plaintiff and Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## <u>COUNT II</u>

**Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act**

67.     Plaintiff repeats all previous allegations as if set forth in full.

68.     Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction.

69.     Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender its shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

70.     As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender its shares.

## COUNT III

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

71.     Plaintiff repeats all previous allegations as if set forth in full.

72.     The Individual Defendants acted as controlling persons of Cynosure within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Cynosure and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

75.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Cynosure, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: February 24, 2017

*/s/ Mitchell J. Matorin*

Mitchell J. Matorin (BBO# 649304)
MATORIN LAW OFFICE, LLC
18 Grove Street, Suite 5
Wellesley, Massachusetts 02482
(781) 453-0100
mmatorin@matorinlaw.com

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*